(Ashtabula County Court of Common Pleas.)

ARTHUR HENDERSON ET AL. *v.* THE OHIO FARMERS' INSURANCE CO.

---

*The act of March 5, 1879, now sections 3643 and 3644, Revised Statutes, construed.*

1. The insurer is required, by the provisions of section 3643, to ascertain the amount of the insurable interest of the applicant in each application, and to ascertain and fix the insurable value thereof.
2. When the insured incumbers a building or structure, which is insured, during the life of the policy, by mortgage, without the consent of the insurer, such incumbrance will not constitute a defense to the policy, unless it is set up as a defense, and it is averred in the answer, and proven upon the trial, that the risk was increased thereby.
3. Whether a risk is increased thereby, is, in every case, a question of fact, to be determined by a jury.

(Decided November, 1894.)

---

HOWLAND, J.

The plaintiff states in the petition a cause of action upon a policy of insurance, and asks for a judgment of seven thousand dollars and more.

VOL. 2—2*

For a defense it is averred in the answer, in substance, that the plaintiffs mortgaged the buildings insured during the life of the policy, without the consent of the defendant, and in violation of an express provision in the policy that it should thereby be null and void; but the answer contains no averment that the risk was increased thereby.

The reply admits these allegations in the answer, but avers the risk was not increased thereby. The question under consideration is raised by a general demurrer to that reply.

We have examined each case cited in argument, and find that the precise question here raised, and raised in the case of the *Dwelling-House Insurance Company* v. *Webster*, 7 C. C. R. 513, has not been raised in either one of the other cases. It is well settled, however, that this incumbrance, in violation of the express provision of the policy, would have avoided it, under the law in force before the passage of the act of March 5, 1879. 35 Ohio St. 606; 11 Ohio St. 477; 42 Ohio St. 519; 22 Wallace, U. S. 47. The question raised by this demurrer is, whether the provisions of that act are applicable in this case, and whether the company is required to ascertain the amount of the insurable interest of the applicant in each case, and fix the insurable value thereof. The determination of this question, depends upon the legal construction to be placed upon said act, which consists of two sections: section one thereof is now section 3643, and section two thereof, is now section 3644, of the Revised Statutes, and they read as follows: "Section 3643. Any person, company or association, hereafter insuring any building or structure, against loss or damage by fire or lightning, by a renewal of the policy heretofore issued, or otherwise, shall cause such building or structure to be examined by an agent of the insurer, and a full description thereof to be made, and the insurable value thereof to be fixed by such agent; in the absence of *any change* increasing the risk; without the consent of the insurers, and also of intentional fraud, on the part of the insured, in case of total loss, the whole amount mentioned in the policy or renewal upon which the insurers receive a premium shall be paid, and in case of a partial loss the full amount of the partial loss shall be paid, and in case there are two or more policies upon the property, each policy shall contribute to the payment of the whole of the partial loss, in proportion to the amount of insurance mentioned in each policy; but in no case shall the insurer be required to pay more than the amount mentioned in his policy."

"Section 3644. A person who solicits insurance, and who procures the application therefor, shall be held to be the agent of the party hereafter issuing a policy, upon such application or renewal thereof, anything in the application or policy to the contrary notwithstanding."

In construing this act, we should look to all the legislation in this state, upon the subject of fire insurance. 13 Ohio St. 454; 23 Ency, 311, 315, notes.

This act is to be liberally construed. 8 Ohio St. 456; Duer on Ins. 161; 2 C. S. C. R. 474.

The business of fire insurance, is a necessity of the age and times; it is alike beneficial to the public and to the private citizen; by it the citizen obtains cheap protection to his property; it affords a safe and convenient security for loans; the largest business enterprises are undertaken and operated upon its assurances. To secure these benefits, public and private, to the people of Ohio, the legislature authorized the incorporation of companies, to do the business of fire insurance; passed and codified laws, to compel the companies to make themselves responsible, for the performance of their contracts; and passed the act under consideration, to regulate their contracts, by doing away with the "open policy," and the multitude of technical and unreasonable defenses, which were an outgrowth of the

"open policy" system; and to require the companies to issue "valued policies," and purge the business of the evils of over-insurance, and unreasonable defenses, with which it was permeated.

In construing *this act*, we should keep in view the purpose of the legislature, in all its legislation, upon fire insurance. The companies and agents were not so much in fault, for the existence and growth of these evils, as the law, by which they were sustained and upheld.

A rule of construction, which is well established, requires the court construing an act, to ascertain the evils which the law was designed to remedy; for that purpose the court must call to its aid all those contemporaneous, external and historical facts, which are necessary for that purpose, and which led to, and caused the enactment. 23 Ency. 336, note; 2 Ohio St. 441; 22 Ohio St. 194; 1 Ohio, 469; 43 Ohio St. 267; 91 U. S. 72; 143 U. S. 457; 43 N. Y. 130.

The following are the evils said act was designed to remedy. In all policies the amount of insurance was stated in two ways. The premiums and commissions were computed upon one statement; and the losses paid upon another. The first, was estimated at the time the policy was issued, which we call the *estimated insurance.* In the other, was stated the highest amount for which the company could be made liable, in any event; and that was the cash value of the property at the time of loss. We call *this, the " cash value."* There was no limit upon the amount of estimated insurance, which might be carried into the policy. When the estimated, was less, or just equal, to the " cash value," the amount of insurance purchased, by the insurer, and the amount sold by the company, were equal. When the " estimated insurance " exceeded the " cash value," the amount of insurance purchased, exceeded the amount sold, by just the amount which the " estimated " exceeded the " cash value." As the liability of the company was limited to the " cash value," the company incurred no liability whatever for such excess. This excess is usually called over-insurance, but it is more accurate, to call it, inflated insurance, as the company incurred no liability for it. The agent received the same commission, and the company the same premium, on each dollar inflated, that they did upon actual insurance. The agent obtaining the most inflation was the most efficient agent. The company which held the largest amount of it, in proportion to its actual insurance, was doing the most successful, and prosperous business. Inflation tended then and now, to induce moral hazard and incendiarism—inflated policies, in the proportion they were inflated, tended to induce carelessness and criminality in the use of fire, in and about the buildings insured by them.

The system of "open policies" did not include technical defenses. They were engrafted upon that system by a multitude of conditions, limitations, contingencies and requirements, and each was made a conditional defense, or forfeiture in the policy, which remained unsettled and dormant, in the fine print of the policy, as so many traps, awaiting a loss; they were sustained as forfeitures and defenses, by the courts, only, because they were in the policies, and therefore a part of the contract; although the company was in no way injured, by them, or the risk increased thereby; they were, therefore, unreasonable and technical defenses and forfeitures. In the event of a loss, they were urged against the insured. The cases were few, in which, one or more of them, could not be urged as such a defense or forfeiture. The necessities of the insured, after the loss; the delays and expense of litigation; the doubtful liability of the company, under the policy, the danger that one or more, technical or unreasonable defenses might be sustained by the court, usually compelled the insured, to accept the inevitable compromise, on any terms he could induce the adjuster to offer.

*The purpose* of the act is, to do away with all technical and unreasonable defenses and forfeitures; establish a uniform rule for determining the validity of all defenses; do away with inflated insurance, and thereby avoid all the consequences thereof, public and private; to do away with computing premiums, upon one amount of insurance, and paying losses upon another; and make the liability of the company definite and certain at the time the policy is issued, and to do away with "open policies" and require and establish the use of "valued policies" in Ohio.

The remedy provided, requires the companies, by their agents, to examine all risks, and fix the insurable value of the applicant therein, and thereby ascertain the amount of insurance the risk will bear, before accepting it; that if accepted, the company will know what amount to carry into the policy, and become liable to pay; to the end, that if any inflated insurance is carried into the policy, it must be done by, and with the knowledge of the company. The intent, reason and spirit of the act, require the company, after examining the risk, and fixing the insurable value thereof, to carefully exclude "inflated insurance" from the policy, or reject the risk. The act seeks to enforce this duty, by making it for the interest of the company to reject all "inflated insurance," by providing that if a company does carry inflation into its policy, it shall be liable therefor, and liable to pay it, in the absence of intentional fraud, or increase of risk. This requirement is in the nature of a penalty therefor, and to exact diligence, and care by the company, in examining and accepting risks, to avoid inflation, and thereby protect their own, and the public interests. Its design, being to change the law, and prohibit the practice which allowed companies to carry into their policies inflated insurance; receive and obtain premiums thereon, without incurring any liability therefor; and to do away with all technical defenses and forfeitures, and to make companies liable for and compel them to pay to the insured, in the event of loss, the whole amount of insurance which they sold him. The evils of inflating the policies in making the contract, and of defeating, or largely reducing the actual insurance by technical and unreasonable defenses in settling losses, prevailed. The policies were carefully prepared in advance, to uphold and perpetuate those evils, for revenue only. They entered into every transaction with the insured, from the signing of the application to the inevitable compromise, or end of the litigation, in settling a loss, to such an extent that it required a legislative enactment to correct them.

"To ascertain the legislative intent, in making a statute, is the purpose of all construction, and interpretation of statutes." 1 Blackstone, 60. "We are to ascertain the legislative intent, from the words used in the whole act, and other acts upon the same subject; the external facts which led to the enactment—the mischief which required a remedy—the reason and spirit of the act, the remedy provided, and the general scope and purpose of the act." 2 Ohio St. 431; 1 Ohio, 469; 43 Ohio St. 119. Although the title is limited to contracts of insurance of buildings and structures, yet section two was made applicable alike to all contracts insuring personal property, as well as buildings and structures, as the evil to be remedied by that section was found, not only in all, but could be remedied in all contracts; thereby showing, that the legislative intent, was to make the application of the remedies of this act co-extensive with the evils to be remedied. Personal property has no fixed location, where it must remain during the life of a policy. Section 3643 could not, therefore, be made applicable to the insurance of personal property. Buildings and structures are the only insurable property which must remain in the fixed location where examined. Interests in them are, therefore, the only property to which that section could apply. The title refers to contracts *of* insurance *of* buildings and structures, for the purpose of distinguishing contracts of

insurance of *all insurable interests in buildings or structures, as a class, from all contracts of insurance of personal property*. There is nothing in the title or the act limiting its application to contracts made upon applications for the insurance of the whole property of a building, or structure, *as in fee:* there-fore we are not restrained by the letter of the statute from construing it to mean and include all contracts for the insurance of any, and all insurable interests in buildings or structures, and thereby give it the meaning its reason and spirit demand.

I. The Supreme Court, in construing this act, holds: "That it was founded on grounds of public policy; that its purpose is to avoid over-in-surance, and to protect the insured against unreasonable forfeitures and de-fenses." 47 Ohio St. 409. Unreasonable forfeitures, and defenses were found alike, in all policies and contracts for insuring all insurable interests of buildings or structures; whether it was a contract for insuring the whole property in a building, *as in fee*, or one for insuring the interest of a life estate therein; or of a remainder; or that of a vendor or vendee, mortgagor or mortgagee, or any other insurable interest therein.

Inflated insurance was found in contracts of insurance of all interests, and was not limited to any one. The evils, and reasons which caused the passage of the act, and required its application to any one, contract of in-surance, of any interest in buildings or structures, were found alike in all contracts, for insuring interests, in buildings or structures, and all required the same remedy, and therefor they all come within the reason, spirit and legislative intent of the act, and are therefore to be governed by its provis-ions, as shown by the following rules of construction, to-wit: *Rule:* "*All cases out of the letter, yet being within the same mischief, or cause, of making the statute, shall be within the same remedy the statute provided.*" Coke's Inst. 24*b*., 2 Ohio St. 442.

*Also, the rule:* "*Where a case is within the manifest intention and reason of the statute, it is within the statute, though at variance with the literal import of the words or language used.*" 3 Ohio St. 80.

II. "By another construction, we arrive at the same result. The word "insurance," as used in this statute, has acquired a technical and legal mean-ing in the law of insurance, and it must be interpreted and given that meaning in construing this act." 11 Ency. 324, notes. Rule 11 hereinaf-ter given.

"It means, as used in the title, and in this act," a contract, "whereby one party, for an agreed premium, undertakes to compensate the other party for a loss, on a specified subject, by a specified peril." 1 Bouvier, 816; 11 Ency. 280. "The term 'insurable interest,' is such an interest in some specified insurable property, that its owner would suffer a loss by the de-struction of the property specified." 11 Ency. 312. "There must be two competent parties to every contract—the insurer and the insured. The in-sured must be the owner of an 'insurable interest' in the property in-sured, or he is *not* a competent party to make the contract. If one makes a contract of insurance, who is not such owner, the contract will be void." 11 Ency. 312, notes.

The *title* limits the provisions of section 3643 to contracts of insurance of insurable interests in buildings and structures. The *act* reads: "Any company, hereafter insuring any building or structure." The company is here referred to as the insurer; the building cannot be the other party, re-ferred to, in the act and title, as the insured, by the use of the word "in-surance"; though omitted, yet the other party to the contract—the owner of the "insurable interest" in the building, asking to be insured, is just as plainly there by application and the meaning of the act, as if the word "owner" had been written therein, *and should be so read in construing the act.*

This construction is required by the rule: "*That which is plainly implied in a statute is as much a part of it, as that which is written in it.*" 50 Ohio St. 330; Endlick Interpt., sec. 417.

III. The title does not refer to any one insurable interest, in buildings, but includes all. It reads: "An act to regulate contracts *of* insur-ance *of* buildings or structures." A contract *of* insurance *of* the insurable interest of a life estate; or of the insurable interest of an estate in remainder; or that of a mortgagee; or of any other insurable interest in a building, are each and all equally, with a contract for insuring the whole prop‧erty in a building—contracts of insurance of buildings. A contract for the insurance of the interest, of a life estate, or of any other insurable interest in a building, has the same safeguards against fire, and is subject to the same exposures, and its degree of risk and hazard is the same as that of a contract of insurance of the whole property, in the same building, and the insurance of each interest in the same building, require the same care in examining the risk and making a description thereof. Therefore, we arrive again at the same result, to‧wit: that "Contracts of insurance of all insurable interests in buildings or structures, come within the provisions of said act, and are governed by its provisions, as shown by the following rules of construction to rule:

The title of an act may be consulted as explanatory of the act. 43 Ohio St. 119 ; 143 U. S. 457:

*Rule:* "*That which is within the manifest intention and reason of the statute, is within the statute; though at varience with the literal import of the language used.*" 3 Ohio St. 80. Therefore, whether we construe said act in compliance with its intent, reason and spirit, or by giving the word "insurance," used therein, its legal meaning, or by consulting its title as explanatory thereof, we arrive at the same result by each one of these ways.

We, therefore, find and hold that each and all contracts of insurance, of any and all insurable interests in buildings or structures, come within the provisions of this act, and should be construed as though the act read: Any person, company or association, hereafter insuring the owner of any insurable interest, in any building or structure, against loss or damage of it by fire or lightning.

The interpretation placed upon this statute, in this opinion, is sus·tained and required by the following rules of construction, which we here quote and number as follows:

1st Rule: "That which is plainly implied in a statute, is as much a part of the statute, as that which is written in it." Endlick on Interpt., section 417 ; 50 Ohio St. 330, *Doyle* v. *Doyle.*

2nd : "That which is out of the letter of the statute, yet being with·in the mischief or cause of the making of the statute, shall be within the same remedy that the statute provided." Coke Inst. 24*b*.; 2 Ohio St. 441.

3rd : "That which is within the manifest intention and reason of the statute, is within the statute; though at variance with the literal meaning of the language used." 3 Ohio St. 80.

4th. "To ascertain the legislative intent, in making the statute, is the purpose of construction and interpretation of statutes, and it is the business of the judges, so to construe a statute as to suppress the mischief and advance the remedy." 1 Blackstone, 60.

5th. "There are three points," says Blackstone, "to be considered in the construction of remedial statutes—the old law, the mischief and rem-edy—that is, how the law stood at the making of the act—what the mis-chief was, which required a remedy—and the remedy provided by the stat-ute." *Ibid.* 50.

6th. "It is by no means unusual, in construing remedial statutes, to extend the meaning of words, beyond their natural import and effect, in

order to include cases which are within the same mischief." Dwarr on Statutes, 734.

7th. "The title of an act may be consulted as explanatory of the act." 43 Ohio St. 119; 145 U. S. 457.

8th. "It is said the power of construing a statute is in the judges, who have authority over all law; especially over statutes; to mold them according to reason and conscience to the best and truest use." 1 Ohio, 459.

9th. "That judges must be careful not to make their authority to construe, a cloak for exercising legislative power; but they are equally bound not to stick in the letter of the law; but must seek for its reason, and spirit, in the evils requiring a remedy, and the general scope of the act, designed to remedy them." 2 Ohio St. 431, *Tracy* v. *Carr.*

This rule, directing the judges, not to stick in the letter of a statute, but to look beyond the letter, to the intent, reason and spirit thereof, in construing it, is stated in another way, by an author, cited by Judge PUGH approvingly in the case of *The Trust Company* v. *Burke,* recently decided and found in the LAW BULLETIN, of Feb'y 4, 1895, (vol. 1, p. 171, Ohio Nisi Prius Reports) and is as follows: "It is only in the jurisprudence of primitive communities that a superstitious reverence for the bald letter of the law, and a corresponding disregard for its spirit, and essence are observable. It is only there that judicial proceedings are governed by set phrases and formulas. A close adherence to the letter, is a mark of unripeness everywhere, and especially so in law."

10th. "When the intention can be ascertained, with reasonably certainty, words may be altered or supplied in the statute, so as to give it effect, and avoid repugnancy, or inconsistencies with such intentions." 23 Ency. 419; 2 Ohio St. 441; 14 Ohio St. 451; 45 Ohio St. 343. "In the last case, the words, '*On the first Tuesday in November next,*' were rejected from the act by construction." 2 Ohio St. 431. "The word, '*Administrator,*' was inserted." 14 Ohio St. 481. "The word, '*Thereafter,*' was inserted." 10 Ohio, 513. "The words, '*Beyond the seas,*' were construed to mean '*Beyond the limins of this state.*'" 1 Ohio "The words, '*Shall be utterly void and of no effect,*' were construed to mean, '*Void as to creditors only,*' but valid as to all others."

11th. "Words which have acquired a technical or legal meaning, when used in a statute, relating to the subject, in which they have acquired such meaning, shall be so interpreted." (This rule applies to the use of the word "Insurance" used in the act and title.) 23 Ency. 324 note.

I. "*The insurable value* thereof" which the act requires the company to ascertain and fix, before accepting the risk, we hold refers to the interest of the applicant in the building. The purpose in part, of this act, was to abrogate the "open policy" system, and to establish "valued policies" in Ohio. Both systems were well known in the law of fire insurance, and the law appicable to each was well settled *and present in the mind of the legislature when the act in question was passed.* An "open policy" or "insurance contract," is one where the sum to be paid, in event of a loss, is not fixed in the policy or contract, except as limited to a sum which it shall not exceed; but is left open, to be determined by the actual loss, after it has occurred.

A "valued policy" is one in which both the property insured, and the loss are valued, and which binds the insurer to pay the whole amount insured, in case of loss, in the absence of fraud. Under an "open policy," in case of loss, the insured must prove the true value of the property destroyed, while under a "valued policy" the sum agreed on is conclusive,

in the absence of fraud.    May on Ins., section 30 ; 45 Penn. 372 ; Wood on Ins., section 41 ; 38 Ohio St. 128 ; 18 Pick. 523 ; 7 Ency. 1002 notes.

All policies issued under this act are in substance required to be " valued policies."    There is no room for contention upon that question. " Valued policies " could be issued under the general law applicable to them ; the degree of hazard, the value of the property and the amount to be paid, in the event of loss, fixed and based upon the representations of the insured.    While this act, not only requires the company to issue a " valued policy," but it goes beyond the general law applicable to them, and for the protection of both parties and the public interest, requires the company to go to, and by agent, examine the building and risk, and ascertain the insurable interest of the applicant, and thereby for itself, *in that way*, ascertain the degree of hazard, and the information by which it can intelligently fix, and is required to fix, the insurable value of the interest of the applicant in the building, and the amount for which it will insure the risk.    The insured is nowhere expressly named in section 3643, yet the liability of the company to him is therein fixed, and what the company shall do in making each and every contract of insurance of buildings or structures, in a *single sentence.*    The company is required in *that single sentence to do everything to be done on its part*, to complete the contract, and to present it, as an offer, by the company, to the insured, including all the terms, and the amount for which it will insure the risk, for his acceptance ; upon his acceptance and the payment of the premium, by an express provision in this sentence, in the event of loss, the company is required to pay to the insured the whole amount it carries into the policy, in the absence of intentional fraud, or increase of risk, without its consent.

The reason and spirit of the act and the interest of the company, require it to exclude all " inflated insurance " from the policy.    The company is therefore required to " fix the insurable value thereof"—not the market or cash value—but the *insurable value* thereof.    Meaning by the use of the words, " *insurable value*," the amount for which it will insure the property, and pay the insured in the event of loss.    When the company is insuring the whole property in a building, under one application, then it would be the whole " *insurable value* " of the whole building, which the company is to ascertain and fix ; but when insuring the interest of a life estate only, if it carried into the policy  the whole insurable value of the whole building, its policy would be inflated, by just the amount which the *insurable value* of the whole building in fee exceeds the insurable value of a life estate therein, and the insurable value of the life estate would depend upon the age, and health of the owner thereof.    In that way, it is shown by the reason, spirit and intent of the act, that it is the insurable value of the insurable interest of the applicant, in each case, which the company is required to ascertain and fix.    The word, " thereof," used in that sentence and connection, refers to the " insurable interest " of the applicant, in the building, in each contract.

We, therefore, hold and construe said act to mean, that the company is required to ascertain and fix the insurable value of the insurable interest of the applicant in each policy it issues.

II.    We arrive at the same result by the reasons following :    By making it the duty of the company to do everything required, to complete the contract, save its acceptance and the payment of the premium by the insured, the act thereby requires the company to ascertain what the insurable interest of the applicant is, in each contract of insurance.

III.    Again, " The company is expressly required to ascertain and 'fix the insurable value thereof,' " which we hold and construe to mean, " the insurable value of the interest of each applicant."    That requirement

includes and requires the company to do everything, which is necessary to be done, to comply with that request.   The agent cannot fix that value, until he ascertains and knows the amount of the insurable interest to be valued.   To require it would be to require an impossibility, and absurdity, which the law never requires, but does require the judges, construing an act, to so construe it, as to avoid *vain and absurd consequences*, and impossibilities, if not restrained by the letter.   It is a presumption of the law that the law maker did not intend such results.   The following rules sustain this construction, to wit :

*First Rule :   " That the law never requires vain or absurd things, is one of the favorite maxims of the law.   It is the duty of courts to adopt that construction, which will avoid absurd consequences and impossibilities.*   39 Ohio St. 661 ; 23 Ency. 358, notes 362.

*Second—A statute should be so construed as to suppress the mischief and advance the remedy.*   1 Blackstane, 60.   *No text imposing obligations is understood to require impossibilities.*   Sedgwick Const., stat. 227.

*Third— Where the statute is susceptible of two constructions, that one will be adopted which will not lead to absurd results.*   23 Ency. 358–362, and notes.

There being no express provision directing how or by whom the insurable interest of the applicant shall be ascertained; yet, the company being required to fix its insurable value, which cannot be done without first ascertaining the amount thereof; therefore, when the letter of the act is considered, and we look through the form to the substance, as found in the intent, reason and spirit of the act, its meaning is apparent ; or, if we look to the requirement of the act that the company shall do everything in making the contract, save its acceptance and payment of the premium by the insured ; or that any other construction leads to absurd consequences and impossibilities.   We arrive at the same results when we hold and construe the act to mean, as hereinbefore stated, that the company is required to and shall ascertain the amount of the insurable interest of each applicant in the building or structure, in each contract of insurance, and fix the value thereof.

The question of who shall ascertain the insurable interest of the applicant, under this act, is an important one, in determining the scope and effectiveness of the act, and the rights of parties under it ; while we hold and construe the act to mean that it is the duty of the company to ascertain the amount thereof, and to fix its insurable value ; yet the act does not direct how that amount shall be ascertained.   The companies, therefore, are at liberty to adopt any mode which will afford that information with the least trouble.   In practice, it will usually be the first thing a company will learn, in relation to the risk, and be of but little trouble to the company.

" *Any change,*" these words are used in the act, in the sentence following :   " *In the absence of any change increasing the risk.*"   The word " *risk,*" as here used, refers to the materials, construction and location of the building ; its safeguards against fire ; its surroundings, exposure and occupancy ; the amount of the insurable interest of the applicant in the building ; the insurable value thereof ; the carelessness and moral hazard of its occupants. The liability of the building to destruction by fire, from any and all these elements, as they are arranged in the building and controlled by the applicant, is the risk.   The company insuring it, is required to examine and determine the degree of hazard of the risk, in fixing the premium and insurable value thereof.   It is the degree of hazard at the time of the examination, which the company insures against.   Any change which decreases the degree of hazard, as it was at the examination, is beneficial to the company ; but any change increasing the risk, as it was then, is prejudicial to

it. *Any change in the amount of the insurable interest of the applicant*, or in the insurable value thereof " which increases the risk," is as prejudicial to the company as a change in the exposures, construction of the building or safeguards therein against fire, which increases the risk," and therefore come within the meaning and spirit of the act, and are goverened by its provisions as required by rules of construction, numbers one, two, three four, six, eight, nine, ten, hereinbefore stated.

The words *"any change"* used in said sentence, refer to changes occurring, after the examination which is required to be made by the company, and to the elements making up the risk, as they then existed and were fixed, which were liable to change, and by the change, to increase the risk. The language does not specify any particular change; or change in any specified thing; but the term is a general one, and in its ordinary meaning, embraces all changes of every element of the risk, which is under the control of the insured; by which the risk may be changed or increased, and it refers to all those changes. This sentence, when considered in connection with all the other provisions of the act, means that, in the event there is no change in any of those things, increasing the risk, and no intentional fraud, the company shall pay the amount mentioned in the policy. The only element of the risk which the act expressly required the company to ascertain and *fix, is,* the insurable value of the insurable interest of the applicant. This requirement is found in the same sentence with, and before, the words *" any change."* This phrase is a general term, and in its ordinary meaning, refers to, and includes any one, of many changes, or any one of all the changes, in the elements of the risk, and refers to, and includes any change in the amount of the insurable interest of the applicant in the building, as well in that of the safeguards against fire and other exposures therein.

We therefore hold and construe the act to mean, that the provisions of said act shall apply to, any and all changes made by the insured in the amount of his insurable interest in the binding and in the insurable value thereof fixed by the company, as well as to changes of the building, exposures or safe-guards against fire.

No change will constitute a defense to the amount of insurance required to be paid, or any part thereof; unless the risk was increased thereby, without the consent of the insurer. The question whether a change does, or does not, increase the risk, is a question of fact, in each case to be determined by a jury. A demurrer searches the entire record for defects and points out, and corrects the defect, if any is found, where it first occurs in the record. There is no averment in this answer, that the change in the insurable value of the property, made by this mortgage, increased the risk. It is therefore, as it now stands, one of the technical defenses, which were *retired* by the passage of said act.

The demurrer is therefore sustained, as to the answer in this case and we hold the answer does not contain a sufficient statement of fact, to constitute a defense.

*F. R. Smith,* and *E. H. Fitch,* for plaintiffs.

*Lee Elliott* and *Wade & Betts,* for defendants.